Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kate Malone (State Bar No. 290884)
Chris K.L. Young (State Bar No. 318371)
Kyle P. Quackenbush (State Bar No. 322401)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:  (415) 500-6800
Facsimile:  (415) 395-9940
Email:  jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        kmalone@saverilawfirm.com
        cyoung@saverilawfirm.com
        kquackenbush@saverilawfirm.com
        areddy@saverilawfirm.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRCT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ADRIAN CENDEJAS, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br> v.<br><br>SONY INTERACTIVE ENTERTAINMENT LLC and SONY GROUP CORPORATION,<br><br>        Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1.     Plaintiff Adrian Cendejas, on behalf of himself and all others similarly situated, bring this Class Action Complaint against Sony Interactive Entertainment LLC and Sony Group Corporation (collectively, "Sony" or "Defendants") for violations of Sections 2 and 3(b) of the Sherman Act, 15 U.S.C. §§ 2 and 3(b), and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), as follows:

## INTRODUCTION

2.     Sony, operating from San Mateo, California, is one of the largest consumer electronics manufacturers in the world, and one of the dominant makers of video game consoles. In 1994, Sony launched its first video game console, the PlayStation. Sony's release of the PlayStation elicited critical acclaim and strong sales; in less than a decade, it became the first computer entertainment platform to ship over 100 million units. Sony revolutionized the console industry with its use of optical discs, heralding the console industry's transition away from cartridges.

3.     Sony has since released five models of the PlayStation—its latest, the PlayStation 5 ("PS5") released to much fanfare on November 12, 2020 in the United States. The PS5 comes in two versions, including a digital-only version, called the PlayStation 5 Digital Edition ("PS5 DE").

4.     Both versions of the PS5 include hardware (a specialized gaming computer known as a console) and software (the operating system that allows users to play video games). Sony's operating system runs various applications, including Sony's PlayStation Store where users can purchase digital copies of video games.

5.     This action concerns Sony's antitrust violations in the market for video games played on the PS5 DE. Among other things, Sony tied the PlayStation Store to the PS5 DE, relying on its monopoly power in the console market to acquire market share in the PS5 video game distribution market. In addition, Sony eliminated competition in the PS5 video game distribution market by refusing to allow retail outlets to sell digital copies of PS5 video games. This conduct is anticompetitive and violates federal antitrust law.

ANTITRUST CLASS ACTION COMPLAINT

6.     Before the PS5 DE was released, consumers could purchase PlayStation video games from game developers and retailers including Amazon, GameStop, Walmart, and Target, among others, on Blu-ray discs that could be inserted into the PlayStation console or in the form of digital download codes that allow for downloading the game to the console. Because the PS5 DE lacks a disc drive, consumers are limited to purchasing digital download codes from retailers and digital copies of games from the PlayStation Store.

7.     Recognizing the price competition digital download codes poses, Sony made the anticompetitive decision to refuse to allow retail outlets to sell video games through digital download codes.

8.     Consumers are thus forced to purchase PS5 games on the PlayStation Store—an application owned and operated by Sony that is pre-loaded on the PS5 DE. Sony does not allow other applications that enable consumers to play video games to run on the PS5 DE. Nor does Sony allow digital download codes sold by retailers to be redeemed through the PlayStation Store. Consumers that purchase a PS5 DE are left with two choices: purchase games directly from Sony using the PlayStation Store, or purchase another console for hundreds of dollars. For those customers who have been in the Sony game console environment for years this is a negative result personally and economically.

9.     Consumers face major costs to switch between PlayStation and Xbox. For example, video games available on the PS4 can be played on the PS5, but cannot be played on the Xbox. Consumers that have built up a library of PS4 games would lose hundreds, if not thousands, of dollars if they switched to Xbox. Also, consumers that use PlayStation are accustomed to the use of the PlayStation controller and gameplay, and have developed social networks within the PlayStation ecosystem that they would lose if they switched to Xbox. Finally, certain games are available only in the PlayStation ecosystem, not on Xbox.

10.     Sony's conduct insulates it from price competition and enables it to charge supracompetitive prices for PS5 video games. Sony charges publishers an approximately 30% commission for every game purchased through the PlayStation Store. This exorbitant

ANTITRUST CLASS ACTION COMPLAINT

commission is passed on to consumers, who end up paying higher prices than they otherwise would have. Sony also effectively quashes the secondary market for PS5 games—consumers can no longer buy and sell their used games at significantly reduced prices. Instead, each time a consumer wants to purchase a PS5 video game—whether a recent or older release—it must purchase a new digital copy from PlayStation through the PlayStation Store.

11.      Sony's decision to tie the PlayStation Store with the PS5 and to eliminate competition from retailers and game developers that could sell digital download codes is anticompetitive. Sony's decision was made solely to eliminate competition and enable it to charge supracompetitive prices for PS5 DE video games. There are no procompetitive justifications for its decision.

12.      As a result of Sony's unlawful acquisition and maintenance of a monopoly over the sale of PS5 video games, Plaintiff and the Class have paid and will continue to pay significant overcharges. Plaintiff seeks damages equal to the amount he has already overpaid, treble damages, and injunctive relief to end the overcharges he will continue to pay until competition is restored to the market.

## THE PARTIES

13.      Plaintiff Adrian Cendejas is a resident of California. Plaintiff has purchased, and will continue to purchase, digital copies of video games directly from Sony through the PlayStation Store to be played on his PS5 DE. Plaintiff has been injured, and will continue to be injured, in his property by paying supracompetitive prices for these video games.

14.      Defendant Sony Interactive Entertainment LLC ("SIE") is a corporation organized and existing under the laws of California, with its headquarters and principal place of business at 2207 Bridgepointe Parkway, San Mateo, California. SIE undertakes product research, development, design, marketing, sales, production, distribution and customer service for PlayStation hardware, software, content, and network services. SIE is a wholly owned subsidiary of the Japanese consumer electronics and media conglomerate Sony Group Corporation.

ANTITRUST CLASS ACTION COMPLAINT

15.     Defendant Sony Group Corporation is a corporation organized and existing under the laws of Japan with its principal place of business at 7-1, Konan 1-Chome, Minato-Ku, Tokyo 108-0075, Japan. Sony Group Corporation is the parent corporation of SIE.

16.     SIE and Sony Group Corporation are collectively referred to as "Sony."

## JURISDICTION AND VENUE

17.     Plaintiff brings this action on his own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 2 and 3(b) of the Sherman Act (15 U.S.C. §§ 2 and 3(b)) and Section 4 of the Clayton Act, 15 U.S.C. § 15(a), as well as any and all equitable relief afforded them under the federal laws pled herein.

18.     Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Sony resides in this District and is licensed to do business in this District. Sony has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme throughout the United States, including in this district. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## INTRADISTRICT ASSIGNMENT

19.     Pursuant to N.D. Cal. Civ. L.R. 3-2(c), (d) & 3-5(b), this action is properly assigned to the San Francisco division because a substantial part of the events and omissions which give rise to the claim emanated from California and more specifically San Mateo County.

## FACTUAL ALLEGATIONS

### A.  Video Game Industry

20.     Video games are played on one of four electronic platforms: (i) smartphones; (ii) personal computers ("PCs"); (iii) arcade game consoles; or (iv) personal game consoles. This

case concerns personal game consoles, specifically the PS5 DE, and video games that are played on that console.

21.     A personal video game console is an electronic device similar to a personal computer that outputs a video signal or visual image to display a video game that one or more people can play through some type of game controller. These may be home consoles which are generally placed in a permanent location connected to a television or other display device and controlled with a separate game controller, or handheld consoles that include their own display unit and controller functions built into the unit and can be played anywhere. Personal game consoles are small personal computers designed specifically to play video games. They have limited if any functionality beyond playing video games and streaming movies.

22.     Initial consoles were dedicated units with only a few games fixed into the electronic circuits of the system (e.g., PacMan at the local arcade). However, video gaming was revolutionized with the advent of personal consoles that individuals could buy and use in their homes. Most personal consoles originally utilized ROM cartridges, swappable game media that enabled users to play separate games simply by inserting a new cartridge.

Figure 1: ROM Cartridge



23.     ROM cartridges allowed the user to rapidly load and access programs and data without using a floppy drive, which was an expensive peripheral during the home computer era, and without using slow, sequential, and often unreliable Compact Cassette tape. An advantage

ANTITRUST CLASS ACTION COMPLAINT

for the manufacturer was the relative security of the software in cartridge form, which was difficult for end users to replicate. However, cartridges were bulky and expensive to manufacture. As disc drives became more common and software expanded beyond the practical limits of ROM size, cartridge slots disappeared from later game consoles and personal computers.

24.     Optical discs replaced ROM cartridges in consoles by the early 2000's. Optical discs are direct access storage devices that are written and read by light. The most common types are CD, DVD and Blu-ray. Optical discs superseded the earlier ROM cartridges because they weighed less, were cheaper to manufacture, and had higher storage capacities. However, optical discs have disadvantages as well. They cost more per GB/TB than any other forms of storage devices. Unless it is a Blu-ray disk, the maximum storage the optical discs can offer is 4.7GB. Also, they are prone to scratching which makes the disk unusable.

Figure 2: Optical Discs



25.     Then came advances in internet bandwidth. Video on demand and online streaming replaced the need for the console hardware required for multimedia tasks such as playing audio and video discs. Game developers and retail outlets began selling digital download codes that users could purchase online, and console manufacturers began to load digital stores onto their consoles for instant access to video games.

26.     Streaming and digital downloads offered convenience—a user no longer had to go to the store to purchase a disc or wait for one to arrive through an online store. Now, video games

ANTITRUST CLASS ACTION COMPLAINT

could be purchased and played instantly with a click of a button or by entering a code into the console. Also, theoretically, digital downloads were cheaper. There is virtually no marginal cost to an additional download, unlike discs which had to be manufactured, loaded with media, and transported to consumers.

27.     Digital downloads are projected to dominate the market. Minami Munakata, an analyst at Goldman Sachs, estimated that the ratio of digital game sales compared to disc-based sales would likely rise from around 51 per cent now to 80 per cent by 2025.

28.     This shift towards digital downloads has presented opportunities for those companies that can control the digital space. Revenues from video games reached approximately $170 billion worldwide in 2020.[1] These revenues are projected to reach $277.95 billion worldwide by 2025.[2]

29.     For the past two decades, three companies have dominated the market for personal video game consoles: Sony, which manufactures the PlayStation; Microsoft, manufacturer of the Xbox; and Nintendo. All three companies periodically release new models of their consoles, with updated hardware and software and new design features.

30.     Nintendo has the longest history of the three, having released a dozen models since its 1985 debut. Microsoft and Sony have released fewer versions of their home consoles— four versions of the Xbox have been released since 2001 and five versions of the PlayStation have been released since 1994.

31.     Sony, Xbox and Nintendo are not limited to manufacturing and selling video game consoles; each also develops and publishes video games. Most PlayStation games come from

---

[1] *Global Video Game Software Market Report 2021*, BusinessWire (Mar. 9, 2021), https://www.businesswire.com/news/home/20210309005558/en/Global-Video-Game-Software-Market-Report-2021-Long-term-Forecast-to-2025-2030-Featuring-Major-Players---Sony-Activision-Blizzard-Microsoft-EA-and-Nintendo---ResearchAndMarkets.com

[2] *Id.*

ANTITRUST CLASS ACTION COMPLAINT

outside developers, while Nintendo develops most of the games for its consoles in-house. The market for Xbox games is more evenly split, with approximately 30% developed by Microsoft.

32.     Video games are not cross-console compatible. For example, a game developed for the PlayStation will not run on an Xbox, and vice versa. However, developers often release versions of their games for all three consoles.

**B.  Sony PlayStation**

33.     Sony is one of the largest manufacturers of video game consoles in the world. In 1994, Sony launched its first video game console, the PlayStation. Sony's release of the PlayStation elicited critical acclaim and strong sales; in less than a decade, it became the first computer entertainment platform to ship over 100 million units. Sony revolutionized the console industry with its use of optical discs, heralding the console industry's transition away from cartridges.

34.     The PlayStation is a computer specially designed for gaming that connects to a display (either a TV, computer monitor, or projector) to enable users to play video games from the comfort of their homes. Sony sells the hardware—the physical console—which is preloaded with the operating system that enables consumers to play games and run various applications, including the PlayStation Store.

35.     Over the last two and a half decades, Sony has released five updated versions of the PlayStation—sequentially numbered 1 through 5. Sony's latest version—the PS5—was released on November 12, 2020. The new system is available in two versions: a standard model ("PS5"), available for $499 retail, and the PS5 DE, which sells for $399 retail.

ANTITRUST CLASS ACTION COMPLAINT

Figure 3: PlayStation 5 and PlayStation 5 Digital Edition



36.     The PS5 includes an optical disc drive, providing users with two option: to (i) continue purchasing physical disc copies of games, available from retailers or game developers; or (ii) buy digital-only copies and download them to their consoles. By contrast, the PS5 DE does not include a disc drive, meaning users can only purchase digital games.

37.     The PS5 is backward compatible with the overwhelming majority of PS4 games. This means that most PS4 games will play on the PS5.

38.     As of March 31, 2021—just four months after its initial release—Sony had sold 7.8 million PS5 consoles, making it the fastest selling console in U.S. history.[3] Through these sales, Sony has earned over $3 billion in revenue.[4] These astronomical sales were achieved despite Sony's inability to supply anywhere close to enough units due to supply-chain failures caused by the coronavirus pandemic.[5] Sales are predicted to surpass 200 million units.

---

[3] *Sony PS5 now fastest-selling console in US history in both unit and dollar sales, says NPD*, CNET (Apr. 16, 2021), https://www.cnet.com/news/sony-ps5-now-fastest-selling-console-in-us-history-in-both-unit-and-dollar-sales-says-npd/

[4] *See* N.F. Mendoza, *PlayStation rakes in $2.6 billion in PS5 sales*, TechRepublic (Feb. 25, 2021), https://www.techrepublic.com/article/playstation-rakes-in-2-6-billion-in-ps5-sales/ (noting PlayStation 5 generated $2.6 billion in sales with 5.21 million counsels sold)

[5] *Still Looking for a New Gaming Console? Here's Why*, The New York Times (Jan. 29, 2021), https://www.nytimes.com/2021/01/29/business/ps5-xbox-console-shortage.html

39.     Despite record revenue from the PS5, Sony claims it sells its console at a loss.[6]
Yet Sony realizes huge profits due to the profit maximizing ecosystem it has built around its
console. Sony has used the console's popularity to build PlayStation into a multifaceted digital
entertainment brand which includes an online store for purchasing and downloading digital video
games directly to the console (the PlayStation Store), a unified online multiplayer gaming and
digital media delivery service (the PlayStation Network), a subscription-based digital video game
streaming service (PlayStation Now), a digital movie and TV distribution service (PlayStation
Video), and Sony's video game development arm (SIE Worldwide Studios).

40.     The PlayStation Store launched on November 11, 2006, available on the
PlayStation 3 console. Since the launch of the original PlayStation in 1994, PlayStation games had
been available only on discs. Starting in 2006, users could access the PlayStation Store and
purchase games directly from their console, and then download them through the PlayStation
Network, which launched at the same time to facilitate the delivery of digital content. Users
could also purchase download codes from the same retailers who sell physical games such as
Amazon, GameStop, Walmart, and Target. The codes could be redeemed on the PlayStation
Network for digital copies of PlayStation games. The Network also allowed users to play games
online against their friends in different locations.

41.     Sony generates the bulk of its profits from digital downloads available through the
PlayStation Store. In 2020, digital downloads made up 62% of sales for PlayStation games,
compared to only 43% in 2018[7] and Sony earned $1.76 billion in revenues in the third quarter of

---

[6] *PS5 Is Being Sold At A Loss, Yet Sony Is Posting Record Profits*, Forbes (Feb. 3, 2021),
https://www.forbes.com/sites/paultassi/2021/02/03/ps5-is-being-sold-at-a-loss-yet-sony-is-posting-record-profits/?sh=791c06185fd2

[7] Mustafa Mahmoud, *62% of all full PlayStation game sales were digital in 2020*, Kitguru (Mar.
12, 202), https://www.kitguru.net/gaming/mustafa-mahmoud/62-of-all-full-playstation-game-sales-were-digital-in-2020/

ANTITRUST CLASS ACTION COMPLAINT

fiscal year 2020 alone through digital sales in the PlayStation Store.[8] These revenues will continue to grow as more and more people buy PlayStation 5, and as those who have already purchased one continue buying new games.

### C. Sony Ties the PlayStation Store to the PS5 DE

42.    As discussed above, the PS5 DE includes two components—hardware and software—that enable consumers to play video games. The hardware comes preloaded with Sony's proprietary operating system ("OS"), and users are not able to substitute Sony's OS for another company's OS. This differs from the personal computer market, where Dell, HP, Lenovo, and others sell the hardware—the PCs—and users can load various OS, such as Apple's iOS, Microsoft's Windows or Linux. You cannot run the Xbox's OS on a PS5.

43.    Sony's OS includes the PlayStation Store—an online marketplace from which users can purchase games on to their device. The PlayStation Store comes pre-loaded onto the PS5 DE and there is no way to remove it. There is also no other option to purchase games on the PS5 DE—a user must use the PlayStation Store.

44.    To use the PlayStation Store, a user must create a master account. A log of all previously purchased items, known as "Download List," records each PlayStation Store account's complete download activity. Each master account is associated with an online virtual "wallet" to which funds can be added. This wallet is then debited when a purchase is made from the store. Money can be added to the wallet through different systems of payment, including credit cards, debit cards, PayPal transfers and prepaid gift cards, but the wallet does not accept cash.

45.    To purchase digital games through the PlayStation Store, users must use the PlayStation wallet. Each time a user transacts using the PlayStation wallet, Sony charges

---

[8] Andy Robinson, *Sony's gaming business is on course for its best-ever year in terms of revenue and profit, its latest financial results have suggested*, VGC (Feb. 3, 2021), https://www.videogameschronicle.com/news/playstation-is-on-course-for-its-best-ever-year-with-4-5m-ps5s-now-shipped/

publishers a commission fee. Upon information and belief, that commission fee is as high as 30%.
Sony tied the PlayStation Store to the PS5 DE to allow it to charge supracompetitive commission
fees. These supracompetitive commission fees were then passed on to consumers, resulting in
higher prices for digital copies of PS5 video games.

**D. Sony Forces Customers to Purchase Games Through the PlayStation Store**

46.     Despite Sony's control over the market for digital copies of PS5 video games
purchased through the PlayStation Store, it faced one potential source of competition.
Historically, consumers could purchase digital download codes for PlayStation games. A
consumer could purchase the digital download code online or instore from a variety of retailers or
visit a game publisher's website to purchase the code. The consumer could then input the code
on the PlayStation and begin playing a digital copy of the game.

47.     In anticipation of the PlayStation 5 launch, Sony eliminated retailers' ability to sell
digital download codes for PlayStation video games, thereby entrenching its monopoly power
over the PlayStation Digital Game Distribution market.[9] In a statement released on March 26,
2019, Sony confirmed what had been circulating as rumor for a number of days, that as of April 1,
2019, Sony would "no longer offer full games through SIE's Global Digital at Retail program."[10]
In other words, Sony would no longer give retailers the ability to sell digital download codes.

48.     Sony claimed the decision "was made in order to continue to align key businesses
globally."[11] In reality, Sony made this decision to monopolize the PlayStation Digital Game

---

[9] *Sony to Stop Retailers Selling PS4 Game Codes on April 1*, PCMag (Mar. 26, 2019),
https://www.pcmag.com/news/sony-to-stop-retailers-selling-ps4-game-codes-on-april-
1#:~:text=Sony%20has%20decided%20retailers%20can,from%20sale%20on%20April%201.&t
ext=The%20decision%20impacts%20all%20retailers,PS4%20game%20in%20digital%20form

[10] Sony confirms it will no longer provide full game digital download codes to shops, Eurogamer
(Mar. 26, 2019), https://www.eurogamer.net/articles/2019-03-26-sony-confirms-plans-to-stop-
giving-shops-full-game-download-codes-to-sell

[11] *Id.*

ANTITRUST CLASS ACTION COMPLAINT

Distribution market. For purchasers of the PS5 DE, the only way they can acquire video games for their system is to purchase them via the PlayStation Store.

49.     Purchasing digital download codes through brick-and-mortar retail outlets has several distinct advantages. *First,* retail availability of digital game codes was especially useful for players who did not or could not use a credit card on the PlayStation Store. *Second*, consumers could make use of trade-in credit from physical games and participate in a robust resale network of buying and selling games second-hand. *Third*, retail outlets often provided special promotions to attract customer traffic to their store, offering video games at a lower price compared to the PlayStation Store. *Fourth*, retail outlets offered advice and recommendations from in-store associates, which was particularly useful given the number of games purchased as gifts by parents, grandparents, and relatives for children and young adults.

50.     Sony's new restrictions established a monopoly over the PlayStation Digital Game Distribution market, swiftly and effectively foreclosing all retail price and quality competition on these games. As a direct and proximate result, purchasers of the PS5 DE are forced to pay supracompetitive prices for video games, since they have no option to buy games on discs. Purchasers of the PS5 DE are also unable to benefit from retail outlets' many benefits, including knowledgeable sales personnel and the aftermarket resale network.

51.     On information and belief, Sony—through SIE Worldwide Studios—charges a 30% commission to publishers for all content sold on its PlayStation Store, including video games. Moreover, to sell games on the PlayStation Store developers and publishers of video games must agree to give Sony complete control over the resale price. By contrast, on information and belief, Sony charges an 11.5% Platform Royalty Fee for physical games sold at external retailers. Retailers retain the right to set their resale prices (i.e., the retail markup). Besides the Royalty Fee and the retail markup, the rest of the purchase price of video games goes to the developer.

52.     Because of the large commission rate, prices for video games available in the PlayStation Store are higher than they would be if publishers retained the right to set prices and retailers could dictate the resale markup. When a consumer buys a video game for their PS5 DE,

and they have no choice but to purchase it from the PlayStation Store, they pay the full purchase price, including Sony's 30% commission, directly to Sony.

53.     In contrast to Sony, Microsoft and Nintendo each allow consumers to buy download codes from the same retailers who sell games on disc, which they then use to download the games directly to their consoles.

**E.  Sony Attempts to Stack the Deck in its Favor**

54.     In 2020, Sony purchased a $250 million stake in Epic Games, the developer behind the popular game Fortnite.[12] Sony invested an additional $200 million in 2021, making a combined investment of $450 million.[13] Fortnite is offered for free on game consoles, including the PS5, on PCs, and on mobile devices. Fortnite generates all its revenue through in-game purchases.

55.     In 2020, Epic sued Apple and Google, arguing that the companies violated the antitrust laws through conduct related to their mobile app stores. Specifically, Epic argued that Apple and Google unlawfully maintain monopoly power over their application store distribution markets, "including by imposing technical and contractual restrictions on [their operating system], which prevents the distribution of [] apps through means other than the App Store and prevents developers from distributing competing app stores to [] users."[14]

56.     Hedging its bets, Epic also introduced legislation to several state legislatures that would allow developers to avoid paying Apple and Google's app store fees.[15] Curiously, the bills

---

[12] https://www.theverge.com/2020/7/9/21318978/sony-epic-games-fortnite-investment-250-million-game-development

[13] *Sony Invests Another $200 Million in Epic's Latest Billion-Dollar Funding Round*, WCCFTech (Apr. 13, 2021), https://wccftech.com/sony-invests-epic-games-another-200-million/

[14] *Epic Games is suing Apple*, The Verge (Aug. 13, 2020), https://www.theverge.com/2020/8/13/21367963/epic-fortnite-legal-complaint-apple-ios-app-store-removal-injunctive-relief

[15] *Epic Games And Match Group Are Pushing States To Pass App Store Regulation That Would Hurt Apple And Google*, Forbes (Mar. 4, 2021), https://www.forbes.com/sites/rachelsandler/2021/03/04/epic-games-and-match-group-are-pushing-states-to-pass-app-store-regulation-that-would-hurt-apple-and-google/?sh=7005b84f1dd5

ANTITRUST CLASS ACTION COMPLAINT

Epic has proposed have a carve out for stores within consoles. This carve out would allow Sony to continue engaging in conduct that Epic (one of Sony's investments) argues is anticompetitive. Sony—through Epic—seeks to protect its monopolistic practices while at the same time hindering its rivals from engaging in similar conduct.

## ANTICOMPETITIVE EFFECTS

57.    Sony's acquisition and maintenance of a monopoly in the market for PlayStation Digital Game Distribution causes consumers to pay more for their PS5 DE games and other content than they would have in a competitive market. It has also caused reduced output of and lower quality PlayStation games than would exist in a free and unrestrained competitive market.

58.    The lack of a truly competitive environment has also led to reduced output and supply of PlayStation video games because developers are barred from selling these games at prices below Sony's mandated and inflated 30% marked-up price. Under basic economic principles, lower prices would generate both increased demand and increased supply to meet that demand in the PlayStation Digital Game Distribution market. Sony's unlawful monopoly naturally restricts both supply and demand.

59.    Evidence of the anticompetitive price effect is already manifesting itself as demonstrated by the current price differences for PlayStation video games across different retailers. For example, on May 5, 2021, three popular video games were available at lower prices from retailers, as described in the tables below.

### Prices across retailers for NBA 2k21 – PS4 (Standard Edition)

| Retailer | Sales Price | Price Difference to PS Store | SIE Commission % | SIE Commission $ |
|---|---|---|---|---|
| PS Store | $59.99 | - | 30 | 17.99 |
| Target | $29.99 | $30 | 11.5 | 3.44 |
| Walmart | $27.93 | $32.06 | 11.5 | 3.21 |
| BestBuy | $19.99 | $40 | 11.5 | 2.29 |

ANTITRUST CLASS ACTION COMPLAINT

| Amazon | $19.99 | $40 | 11.5 | 2.29 |
| GameStop (new) | $18.99 | $41 | - | - |
| eBay (used) | $17.99 | $42 | - | - |

**Prices across retailers for Madden NFL 21 - Standard Edition PS4/PS5**

| Retailer | Sales Price | Price Difference to PS Store | SIE Commission % | SIE Commission $ |
|---|---|---|---|---|
| PS Store | $59.99 | - | 30 | 17.99 |
| GameStop | $29.99 | $30 | 11.5 | 3.44 |
| Amazon | $28.50 | $31.49 | 11.5 | 3.27 |
| Target | $19.99 | $40 | 11.5 | 2.29 |
| BestBuy | $19.99 | $40 | 11.5 | 2.29 |
| Walmart | $19.88 | $40.11 | 11.5 | 2.28 |
| eBay (used) | $7.00 | $52.99 | - | - |

**Prices across retailers for Red Dead Redemption 2 - Standard Edition PS4**

| Retailer | Sales Price | Price Difference to PS Store | SIE Commission % | SIE Commission $ |
|---|---|---|---|---|
| PS Store | $59.99 | - | 30 | 17.99 |
| Amazon | $37.99 | $22 | 11.5 | 4.36 |
| BestBuy | $29.99 | $30 | 11.5 | 3.44 |
| Target | $29.99 | $30 | 11.5 | 3.44 |
| GameStop (used) | $27.99 | $32 | - | - |
| Walmart | $27.88 | $32.11 | 11.5 | 3.20 |
| eBay (used) | $10.50 | $49.49 | - | - |

60.     The market for video games on disc provides a helpful benchmark for what prices would look like in a competitive market for digital games. There is no legitimate reason digital

ANTITRUST CLASS ACTION COMPLAINT

video games should be more expensive than their physical counterparts. In fact, given the higher input costs involved in manufacturing, packaging and distribution, prices for games in a truly competitive market for digital games would likely be substantially lower than they are for games on disc. The only explanation for the stark price differences is Sony's ability to charge supracompetitive prices by eliminating price competition with retailer outlets.

61.     As game discs are replaced with digital distribution, Sony has positioned itself to gain an ever-increasing share of the market for all PlayStation games.

62.     The existence of supracompetitive pricing, reduced consumer choice among market alternatives, and reduced output and supply demonstrate that Sony's monopolistic conduct has injured competition generally in the market for digital PlayStation games, precisely the type of harm the antitrust laws were enacted to remedy.

### ANTITRUST IMPACT

63.     Plaintiff has been injured by Sony's anticompetitive conduct because he paid more for his PS5 DE video games than he would have paid in a competitive market. Plaintiff has also been injured because Sony's unlawful monopolization of the PlayStation Digital Game Distribution market extinguished Plaintiff's freedom of choosing between video games sold through the PlayStation Store and lower cost alternatives that would have been available had Sony not monopolized the market. Plaintiff is deprived of beneficial aspects of the retail sales channel, including knowledgeable sales personnel and a robust secondary market to buy and sell pre-owned video games.

64.     Plaintiff is also harmed by less of innovation. The lost profits to developers caused by Sony's monopolization reduces their incentive to create new and innovative games for the PS5 DE, which causes Plaintiff to suffer injury in the form of reduced quality and lower output of PS5 DE games.

ANTITRUST CLASS ACTION COMPLAINT

## EFFECT ON INTERSTATE COMMERCE

65.    During the relevant time period, Sony manufactured, marketed, sold, and shipped PS5 DE consoles and PlayStation 5 games across state lines in an uninterrupted flow of interstate commerce.

66.    During the relevant time period, Plaintiff and Class members purchased PS5 DE consoles, digital videogames, other digital content, and related services from Sony and/or its agents. As a result of Sony's illegal and anticompetitive conduct, Plaintiff and Class members were compelled to pay, and did pay, artificially inflated prices for one or more of the aforementioned products and services.

67.    During the relevant time period, Sony employed various instrumentalities of interstate commerce to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce.

68.    Defendants' conduct was within the flow of and was intended to have and did have a direct, substantial, and foreseeable effect on interstate commerce.

69.    Sony's conduct has also had substantial intrastate effects in that, among other things, consumers paid overcharges in each state. Sony's conduct materially deprived the consuming public—including of purchasers in each state—of any choice to purchase more affordable PS5 DE games from retailers other than Sony. The absence of competition for PS5 DE games has, and continues to, directly and substantially affect and disrupt commerce within each state.

## RELEVANT MARKETS AND MONPOLY POWER

70.    There are two relevant product markets in this case, and Sony has monopoly power in each.

71.    *First*, there is the product market for the PS5 DE console (the "PS5 DE Gaming Platform" market). As discussed above, the PS5 DE is a console that enables users to play PlayStation games. Unlike the PS5, the PS5 DE does not have an optical disc drive—users must

ANTITRUST CLASS ACTION COMPLAINT

purchase digital games to utilize the PS5 DE. The PS5 DE is also sold at a $100 discount compared to the PS5.

72.    Sony controls 100% of the PS5 DE Gaming Platforms market. No other company creates a console that can run PlayStation games. The PS5 and the PS5 DE are not interchangeable because of the large price discount. Consumers faced with a small but significant and non-transitory increase in price ("SSNIP") would not transition away from the PS5 DE to the PS5.

73.    Furthermore, other game consoles are not interchangeable. Due to the high cost of consoles (anywhere from $300 to $600), the differentiation among them, and the lack of cross-compatibility of video games, each console creates a separate market for games that can be played on it. A SSNIP to the price of games for one console will not, therefore, cause a consumer to switch to one of the other consoles.

74.    There are also high barriers to entry in the console market. As discussed above, over the last two decades there have only been three competitors in the console market—Sony, Xbox, and Nintendo. It is unlikely that a new console will come on to the market soon to take market share away from the three dominant players. Console development is costly and takes significant time. Popularity derives from network effects (a large enough community of gamers and game developers to make the console attractive), familiarity with the console and marketing.

75.    *Second*, digital video games played on the PS5 DE are a relevant market (the "PlayStation Digital Game Distribution" market). Sony controls 100% of the PlayStation Digital Game Distribution market after its decision to make inoperable digital download codes sold by retailers. Today, consumers that purchase a PS5 DE have only one option to play video games—purchase directly from Sony on the PlayStation Store.

76.    Historically, there was vigorous price competition among retailers within the PlayStation Digital Game Distribution. Retailers tried to offer the best price and services to consumers and thereby gain a higher share of the market while maintaining profits. For

ANTITRUST CLASS ACTION COMPLAINT

PlayStation games, Sony's only role in this market was to take its Royalty Fee from every game sold. It had no control over the price of games.

77.    By prohibiting resale of PS5 DE games except through the PlayStation Store, Sony established a complete monopoly in the market for PlayStation Digital Game Distribution. Sony has a 100% market share in the relevant market.

78.    Digital distribution of video games sold on other consoles is not substitutable because video games are not cross-platform compatible. An Xbox digital download code cannot be used to play video games on a PS5 DE.

79.    Furthermore, consumers would not purchase a new console faced with a SSNIP on digital PlayStation games. Consoles cost anywhere from $300 to $600, whereas games cost at most $60.

80.    The relevant geographic market is the United States, its territories, possessions, and the Commonwealth of Puerto Rico.

## CLASS ACTION ALLEGATIONS

81.    Plaintiff brings this action on behalf of himself and all others similarly situated as an action under Federal Rules of Civil Procedure 23(a), (b)(2) and (3), seeking damages and injunctive relief on behalf of the following class:

> All persons in the United States who purchased a video game through the PlayStation Store while using the PS5 DE at any time from November 12, 2020 through the present (the "relevant time period").

This definition specifically excludes the following person or entities:

a.    Sony and its parent companies, subsidiaries, and affiliates;

b.    Any of Sony's officers, directors, management, employees, subsidiaries, affiliates or agents;

c.    All governmental entities;

d.    The judges and chambers staff in this case, as well as any members of their immediate families; and

ANTITRUST CLASS ACTION COMPLAINT

1

        e.     Any counsel in this litigation.

2

    82.    The Class seeks damages for the overcharges they have paid since Sony

3

monopolized the relevant market, and permanent injunctive relief to prevent or remedy the

4

unlawful conduct alleged herein and thereby restore competition in the relevant market.

5

    83.    Members of the Class are so numerous and geographically dispersed that joinder

6

of all members is impracticable. Upon information and belief, there are at least one million Class

7

members who reside in and have purchased a video game through the PlayStation Store while

8

using a PS5 DE in the United States. Moreover, given the costs of complex antitrust litigation, it

9

would be uneconomic for many class members to bring individual claims and join them together.

10

The Classes are readily identifiable from information and records in the possession of Defendants

11

and third parties.

12

    84.    Plaintiff is a member of the Class he seeks to represent, and his claims arise from

13

the same factual and legal bases as those of the Class; he asserts the same legal theories as do all

14

Class members.

15

    85.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's

16

claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the

17

other Class members. Plaintiff and all members of the Class were damaged by the same wrongful

18

conduct: Sony's monopolization of PlayStation Digital Game Distribution market. Plaintiff and

19

all members of the Class paid supracompetitive prices for PS5 DE video games and were

20

deprived of the benefits of retail competition as a result of Sony's unlawful monopoly.

21

    86.    Plaintiff will fairly and adequately protect and represent the interests of the Class.

22

The interests of Plaintiff are aligned with, and not antagonistic to, those of the other members of

23

the Class.

24

    87.    Plaintiff is represented by counsel who are experienced and competent in the

25

prosecution of class action antitrust litigation.

26

    88.    Questions of law and fact common to the members of the Class predominate over

27

questions that may affect only individual Class members. Overcharge damages with respect to

28

ANTITRUST CLASS ACTION COMPLAINT

the Class as a whole are appropriate because Sony acted on grounds generally applicable to the entirety of the Class. Such generally applicable conduct is inherent in Sony's unlawful creation and maintenance of a monopoly in the market for PlayStation Digital Game Distribution. Questions of law and fact common to the Classes include, but are not limited to:

> a) Whether Sony unlawfully created, maintained and continues to maintain monopoly power in the relevant market;
>
> b) Whether Sony's unlawful monopoly has caused and continues to cause anticompetitive effects in the relevant market;
>
> c) Whether Sony unlawfully tied its PlayStation Store to its PlayStation console;
>
> d) Whether procompetitive justifications exist, and if they do, whether there were less restrictive means of achieving them;
>
> e) Whether Sony's unlawful monopoly has substantially affected intrastate and/or interstate commerce;
>
> f) Whether Sony's unlawful monopoly caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;
>
> g) Whether injunctive relief is warranted to restore competition in the relevant market; and
>
> h) The quantum of overcharges paid by the Classes in the aggregate.

89. The common questions of law and fact are identical for each and every member of the Class.

90. Plaintiff will thoroughly and adequately protect the interests of the Class, having obtained qualified and competent legal counsel to represent himself and those similarly situated.

91. The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and cause needless expenditure of judicial resources.

92. Plaintiff is typical of the Class in that his claims, like those of the Class, are based on the same anticompetitive conduct and the same legal theories.

93. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

94.     Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Monopolization of the PS5 Distribution Market (15 U.S.C. §§ 2 and 3(b)) (Damages)

95.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

96.     Sony has willfully acquired and maintained monopoly power in the relevant markets for PS5 DE Gaming Platforms and PlayStation Digital Game Distribution. Sony has the power to control prices or exclude competition in the relevant markets.

97.     Sony has a 100% share of the relevant market for PS5 DE Gaming Platforms and PlayStation Digital Game Distribution, and there are substantial barriers to entry in each relevant market.

98.     Sony at all relevant times, retained exclusive control over the design, features and operating software for the PS5 DE.

99.     Sony has willfully acquired and maintained monopoly power in the PlayStation Digital Game Distribution market by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to its decision to tie the PlayStation Store to the PS5 DE Gaming Platform and refusal to allow digital download codes for PS5 to be sold by retailers.

100.     Publishers that would like to publish games enabled for the PS5 DE Gaming Platform must sell all their games through the PlayStation Store. This constitutes a de-facto tie

ANTITRUST CLASS ACTION COMPLAINT

involving the PS5 DE Gaming Platform and the PlayStation Store, as publishers cannot avoid the PlayStation Store if they want access to the PS5 DE Gaming Platform.

101.    Sony specifically intended to eliminate price competition from other digital video game retailers so that it could monopolize the PlayStation Digital Game Distribution market and derive supracompetitive profits therefrom.

102.    Sony's anticompetitive conduct is not justified because its conduct does not enhance overall efficiency or make the relevant market more efficient.

103.    Sony's conduct has had a substantial effect on interstate commerce.

104.    Plaintiff and the Class have been or will be injured in their property as a result of Sony's conduct.

105.    Plaintiff and members of the Class have suffered and will continue to suffer economic injury to their property as a direct and proximate result of Sony's unlawful monopolization. This injury is of the type that the antitrust laws were intended to prevent. Plaintiff has been and will be injured by the harm to competition as a result of Sony's conduct. Sony is therefore liable for treble damages, costs, and attorneys' fees in amounts to be proved at trial.

## SECOND CAUSE OF ACTION

### Sherman Act Section 2—Monopolization of the PS5 Distribution Market (15 U.S.C. §2) (Declaratory and Injunctive Relief)

106.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

107.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

108.    Plaintiff's allegations described herein constitute a violation of Section 2 of the Sherman Act.

109.    Sony effectuated a scheme to create and maintain a monopoly in the PlayStation Digital Game Distribution market. The goal, purpose and/or effect of the scheme was to

eliminate and/or suppress price competition in order to charge supracompetitive prices for video games that can be played on the PS5 DE.

110.    The anticompetitive conduct alleged herein should be declared illegal.

111.    Plaintiff and the Class have been injured in their business or property by reason of Sony's antitrust violations alleged in this Count. Their injury consists of paying higher prices for PS5 DE video games than they would have paid in the absence of those violations. These injuries will continue unless halted.

112.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of § 2 of the Sherman Act.

113.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct. Sony's unlawful conduct is continuing and will continue unless it is permanently enjoined. The anticompetitive effects of Sony's unlawful conduct in the relevant market are continuing and will continue absent an injunction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, and the proposed Class, pray for judgment against Sony as to each and every claim made herein and for the following relief:

A.    An order determining that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and appoint the Plaintiff as the named representative of the Class;

B.    Injunctive relief restoring competition to the PlayStation Digital Game Distribution market and permanently enjoining Sony from continuing the unlawful conduct alleged here, and from engaging in similar or related conduct in the future;

C.      An award to Plaintiff and the Class consisting of treble damages in an amount to be determined at trial; pre and post-judgment interest; and costs, expenses, and reasonable attorneys' fees; and

D.      Any other and further relief the case may require, and the Court may deem just and proper under the circumstances.

## JURY DEMAND

114.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of himself and the proposed Classes, demands a trial by jury on all issues so triable.

Dated: May 7, 2021

By:     _/s/ Joseph R. Saveri_
                    Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kate Malone (State Bar No. 290884)
Chris K.L. Young (State Bar No. 318371)
Kyle P. Quackenbush (State Bar No. 322401)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
        swilliams@saverilawfirm.com
        kmalone@saverilawfirm.com
        cyoung@saverilawfirm.com
        kquackenbush@saverilawfirm.com
        areddy@saverilawfirm.com

_Counsel for Plaintiff and the Proposed Class_

ANTITRUST CLASS ACTION COMPLAINT